J-S26018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: O.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 550 MDA 2024 |

Appeal from the Order Entered March 26, 2024
In the Court of Common Pleas of Columbia County Orphans' Court at
No(s):  CP-19-OC-202-2023

BEFORE:  PANELLA, P.J.E., OLSON, J., and KUNSELMAN, J.

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 15, 2024**

Appellant, K.L., ("Mother") appeals from the March 26, 2024 order entered in the Court of Common Pleas of Columbia County that terminated her parental rights to the dependent child, O.C., a female child born February 2022, ("the child") pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[1]  We affirm.

The record demonstrates that, on November 22, 2023, the Columbia County Children and Youth Services ("CYS") filed a petition for involuntary termination of Mother's parental rights pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).  Jedediah H. Lemon, Esquire ("Attorney Lemon") served as the guardian *ad litem* to represent the legal and best

_____

[1] In the March 26, 2024 order, the trial court also terminated the parental rights of the biological father, G.S., ("Father").  Father did not participate in this appeal.

interest of the child.[2]   Kelly Lenahan, Esquire ("Attorney Lenahan") represented Father.  Mother was represented by Eric A. Williams, Esquire ("Attorney Williams").  Hugh Taylor, Esquire ("Attorney Taylor") served as counsel for CYS.  On March 20, 2024, the trial court conducted a hearing on the involuntary termination petition, as well as a petition for goal change.  The aforementioned counsel, as well as Mother were present at the hearing.  N.T., 3/20/24, at 4, 13.  Father did not attend the termination hearing.  *Id.* at 13.  At the conclusion of the termination hearing, the trial court involuntarily terminated Mother's parental rights to the child.[3]  This appeal followed.[4]

_____

[2] Since the child who was the subject of the instant termination proceedings was only two years of age, we take notice that there is no basis for a conflict in the guardian *ad litem*'s role in representing the child's legal and best interests.

[3] In its Pennsylvania Rule of Appellate Procedure 1925(a) opinion, the trial court granted CYS's petition for a goal change, and the child's goal was changed to one of adoption.  Trial Court Opinion, 5/16/24, at 1.  The trial court further noted that Mother did not appeal the goal change order.  *Id.*

The order granting CYS's petition for a goal change was filed in the trial court's dependency docket, 37-DP-2022, which is not part of the certified record currently before us.  On appeal, Mother challenges only the March 26, 2024 order involuntarily terminating her parental rights to the child.  *See* Notice of Appeal, 4/17/24; *see also* Rule 1925(b) Statement, 4/17/24; Mother's Brief at 6.  As such, we do not review the goal change order.

[4] Mother filed a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), along with her notice of appeal, on April 17, 2024.  The trial court filed its Rule 1925(a) opinion on May 16, 2024.

Mother raises the following issue for our review: "Whether the [trial c]ourt erred as a matter of law in terminating [Mother's] parental rights[?]" Mother's Brief at 6.

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the [trial] court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion[. W]e reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 255 A.3d 343, 358-359 (Pa. 2021) (citations, original brackets, and quotation marks omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent

evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for termination followed by an assessment of the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the [trial] court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the [trial] court determines that the parent's conduct warrants termination of his or her parental rights does the [trial] court engage in the second part of the analysis pursuant to Section 2511(b)[ - ]determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*B.J.Z.*, 207 A.3d at 921 (citation omitted). Section 2511 requires clear and convincing evidence to support the grounds for termination, which we have defined as proof that is "so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Z.P.*, 994 A.2d 1108, 1116 (Pa. Super. 2010) (citation omitted). A child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be

put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re I.J.*, 972 A.2d 5, 9 (Pa. Super. 2009).

Here, CYS sought involuntary termination of Mother's parental rights to the child pursuant to Section 2511(a)(1), (a)(2), (a)(5), and (a)(8). Section 2511(a) states, in pertinent part, that,

### § 2511. Grounds for involuntary termination

**(a)** **General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8).

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination is in the best interests of the child. Section 2511(b) states,

## § 2511. Grounds for involuntary termination

. . .

**(b) Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6)[,] or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). The analysis under Section 2511(b)

focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [Section] 2511(b) does not explicitly require a bonding analysis and the term "bond" is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of

our analysis. While a parent's emotional bond with his or her child is a major aspect of the [Section] 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the [trial] court when determining what is in the best interest of the child.

> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of J.N.M.*, 177 A.3d 937, 943-944 (Pa. Super. 2018) (citation and original brackets omitted), *appeal denied*, 183 A.3d 979 (Pa. 2018). A trial court may rely on a caseworker or social worker to determine the status of and nature of a parent-child bond. *J.N.M.*, 177 A.3d at 944 (holding, a trial court "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert" (citation omitted)); *see also In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (holding, a trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond" (citation omitted)).

In the case *sub judice*, at the conclusion of the termination hearing, the trial court made the following findings of fact:

1. Petitioner is [CYS].

2. [Mother and Father] are the [biological] parents of the [child]. Mother has been living in Lancaster County[, Pennsylvania,] since her release from jail in July 2023.

3.   Summarily, while with Mother and Mother's boyfriend, [the child] was severely injured in March [] 2022[,] and hospitalized. [The child] was released to Mother but [was] injured again on [] May 11, 2022, when her retinas were detached. [The child] was placed in [CYS's] care on May 11, 2022, as a result of the abuse. Mother was given custody to the exclusion of [her boyfriend. Mother's boyfriend] was arrested and released on bail. In June and July 2022[,] Mother was with [her boyfriend] in the presence of the child. The child was hospitalized [at] Geisinger Medical Center. Mother []moved the child [from Geisinger Medical Center] to Children's Hospital of Philadelphia ([]"CHOP"). [Mother] then took the child from CHOP against medical advice. The child deteriorated and was again hospitalized. [As stated *supra*, CYS] became involved in the case on May 11, 2022, and prohibited contact with [Mother's boyfriend]. On July 20, 2022, [CYS] assumed custody of the child through a shelter care application.

4.   Mother filed a [petition for a protection from abuse ("PFA") order] on behalf of herself in June 2022[,] against [her boyfriend]. The PFA [matter] was dropped by Mother in September 2022.

5.   The [guardian *ad litem*] filed a [petition seeking a] PFA [order] against Mother on behalf of the child right after [CYS] assumed custody [of the child in July] 2022. The PFA [petition] was granted prohibiting contact between Mother and the child.

6.   The child's injuries were caused by the abuse and are indeed profound. She had a closed head injury. Her skull was fractured. She has detached retinas and is essentially blind. She cannot speak although she can utter some sounds. She cannot walk. She can barely move. She is fed by a tube. She needs constant care in order to survive.

7.   [Mother's boyfriend] was arrested. He pleaded guilty to [conspiracy to endanger the welfare of a child] and endangering the welfare of children on November 16, 2022. He was sentenced to [16 to 120 months' incarceration] on the [endangerment conviction] and [5 to 10 months' incarceration] on the [conspiracy conviction, with the

- 8 -

sentence set] to run consecutively to [the sentence imposed on the endangerment conviction.[5]]

8. As a result of [events involving the child that occurred in July 2022,] Mother was [charged with] conspiracy to commit aggravated assault and [conspiracy to] endanger[] the welfare of children. That case has been continued numerous times. [The trial] court told Mother that she had a right to remain silent about the facts of that case during her [termination hearing] testimony. Nevertheless, she testified [at the termination hearing] concerning her actions and omissions.

9. Mother is presently on probation supervision for an event in 2022[,[6]] where she falsely accused [Father] of rape.

10. The family service plan [dated] August 22, 2022, required that Mother assure the basic needs and safety of the child; comply with professional services recommended by [CYS]; engage in [a] family reunification program; undergo [a] mental health evaluation and follow recommendations; provide appropriate housing; take parenting classes; be drug free; and avoid additional criminal charges.

11. Mother has not achieved the objectives of the family service plan.

12. Mother does not have adequate and stable housing and has not been able to assure the child's safety. She did not complete parenting classes.

13. Mother has two other children. One child lives with [the maternal grandmother]. The other child lives with the [biological] father. Mother's bond with [the child, who is the subject of the case *sub judice*,] is non-existent.

---

[5] The boyfriend's conspiracy conviction stemmed from events involving the child that occurred in July 2022. The boyfriend's endangerment conviction stemmed from the child abuse that occurred in May 2022.

[6] On July 10, 2023, Mother pleaded guilty to one count of false reports to law enforcement authorities – falsely incriminating another, 18 Pa.C.S.A. § 4906(a), for events which occurred on January 22, 2022, involving Father.

14. Mother's housing has been unstable during most of the time since the child was severely abused.

15. In February 2022, Mother knew that [her boyfriend] was violent with children. Nevertheless, Mother allowed [her boyfriend] to care for the child in March 2022[,] when the child was severely abused and hospitalized. Again, [Mother] allowed [her boyfriend] to be with the child on May 11, 2022, when the child was again severely abused and hospitalized. She continued to consort with [her boyfriend both before and after the child was hospitalized at, and subsequently removed from, the Geisinger Medical Center and CHOP].

16. Mother did not see [the child] from August 2022[,] until July 2023, while she was incarcerated, nor has she seen her since. She made minimal efforts to contact the child, although any attempts to communicate with the child would have been essentially futile because of the severity of the injuries from the abuse. Mother has not seen the child to date because of the PFA order.

17. Mother has had continuing drug abuse issues. She has been in several drug [rehabilitation programs], the last being in December 2023, about three months before the [termination] hearing. She [] recently made steps to get drug counseling and to attend self-help meetings.

18. Mother [] recently secured employment and housing for herself, although at the time of [the termination] hearing, there was a pending eviction. Recently, she has cooperated generally with [CYS], although it is way too little and way too late, particularly in light of the child's injuries, her significant needs, and the wonderful care she is receiving [from her foster parents].

19. [CYS] made reasonable efforts to assist Mother in her efforts to achieve her objectives. However, she was not cooperat[ive] for a long time and she has not achieved those objectives. There is no evidence that she can adequately care for this child who has significant needs and requires specialized care [as a result of] the 2022 abuse.

[20.] At the time of the [termination] hearing, the child ha[s] been in the care of [CYS] for 20 months, not counting the

time when [Mother] was on the run with the child after removal of the child from the hospital.

[21.] After hospitalizations, [the child] was living with her great aunt, who understandably told [CYS] that she could not provide the extensive care that [the child] required. Since about July 2023, [the child] has been in a loving foster home that specializes in special needs children. Despite her severe injuries and her extraordinary needs, she is comfortable and very well treated. She is fed by a tube. The environment must be very clean to avoid illnesses. Her limbs are stretched and [massaged] daily to assure mobility to the extent she has any. She is given [medications] several times each day on a schedule.

[22.] The services or assistance available to Mother are not likely to remedy the conditions which led to the removal or placement with a reasonable period of time. Of course, Mother can never remedy the significant and permanent incapacity inflicted upon [the child].

[23.] It is in the best interest of the [] child that parental rights be terminated because termination would best serve the developmental, physical, and emotional needs and welfare of the child.

[24.] The [] child has been removed from the Mother by the [trial] court and more than 12 months have elapsed from the removal and placement and the conditions which led to the removal continue to exist and termination of parental rights would best serve the needs and welfare of the child.

[25.] The [guardian *ad litem*] agrees that termination of parental rights is supported by the facts and the law and is in the child's best interests.

[26. CYS's] witnesses were credible.

Trial Court Opinion, 5/16/24, at 2-6 (extraneous capitalization omitted).

It is well-established that this Court need only agree with the trial court as to any one section of Section 2511(a), as well as Section 2511(b), in order to affirm an order involuntarily terminating parental rights. ***In re B.L.W.***,

843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Our review of the certified record confirms that CYS introduced clear and convincing evidence in support of termination pursuant to Section 2511(a)(8) and Section 2511(b).

> To terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. 23 Pa.C.S.A. § 2511(a)(8). Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the [trial] court. Once the 12-month period has been established, the [trial] court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [CYS] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the [trial] court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYS services.

*In re C.B.*, 230 A.3d 341, 348 (Pa. Super. 2020) (case citations, quotation marks and original brackets omitted), *appeal denied*, 234 A.3d 410 (Pa. 2020). "Under Section 2511(a)(8), in determining whether the conditions that led to removal and placement continue to exist, the relevant inquiry in this regard is whether the conditions that led to removal have been remedied and[,] thus[,] whether reunification of parent and child is imminent at the time of the hearing." *C.B.*, 230 A.3d at 348-349 (citation, original quotation marks, and original brackets omitted).

> With respect to the "needs and welfare" analysis pertinent to Sections 2511(a)(8) and (b), we have observed:

- 12 -

Initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical[,] and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a [trial] court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a [trial] court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of the child, as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 349 (citation, original brackets, and some quotation marks omitted).

Here, Mother asserts that the trial court erred in finding that the conditions which led to the removal of the child continue to exist. Mother's Brief at 27-32. Mother contends that the "reason [the child] was placed with [CYS] was because [Mother allowed] the [] child [to be] around [the boyfriend,] who was found to be [a child] abuser by [CYS]." *Id.* at 27. Mother argues that her testimony at the termination hearing established that she is no longer in a relationship with her boyfriend and "that she has not talked with him since they got arrested." *Id.* at 27-28. Mother further asserts that CYS failed to demonstrate that Mother continues to struggle with drug abuse, mental health concerns, or "any other diagnosis that would require a great

deal of time for complete recovery" such that reunification with the child could not be achieved. *Id.* at 29. Mother contends that, to the contrary, the evidence establishes, and the trial court found, that Mother was "doing very well" with her drug addiction and mental health issues and that she has "improved greatly" in her rehabilitation programs. *Id.* at 29, 31-32.

The trial court explained its reasons for terminating Mother's parental rights to the child pursuant to Sections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b) as follows:[7]

> The primary issue is whether after [more than 20] months of placement, the conditions that led to removal persist, and whether the conditions can be remedied within a reasonable period of time.[FN2] The best interests of [the child] are a prime consideration. The [trial] court finds that the conditions that led to placement persist and cannot be reasonably remedied within a reasonable time. It is in the child's best interest to terminate parental rights.
>
>> [Footnote 2:] There is no indication that Mother has sincere remorse about [her boyfriend's] repeated abuse of [the child].
>
> The [trial] court also finds that [Mother] evidenced a settled purpose of relinquishing parental claim and failed to perform parental duties since the child was born or at least since [M]arch 2022[,] when the child was first assaulted by choosing an abusive paramour over her child, repeatedly.
>
> . . .

---

[7] Although our decision to affirm the termination of Mother's parental rights rests upon Section 2511(a)(8) and Section 2511(b), we incorporate the entirety of the trial court's findings pertaining to all of the provisions in Section 2511(a) because of the substantial overlap between these statutory provisions and the elements of Section 2511(a)(8).

Mother argues that she now finally has some semblance of housing and maybe a job, although there is no indication that the job or housing are stable. She just finished another stint in [a] drug [rehabilitation program] in December 2023. Her sobriety is tenuous at this point.

Importantly, her plan for housing stability, safety, basic needs of the child, and improved parenting skills are fragile plans at best. This is after two years. . . .

After two years, [Mother's] promise alone of self-sufficiency is not doing this child any good. [The child] needs stability and hope. After years, Mother provides neither hope nor stability, or safety for this child. Mother gives no sincere or solid assurances that she will not consort with [her boyfriend] and ignore obvious dangers to her child.

. . .

In this case, Mother [] failed to perform parental duties. She has continued to struggle with [drug addiction] since being released from prison. She is being evicted from her housing. She has tenuous employment. Her other two children do not live with her, and she has not seen them since at least July 2023. She has a history of dishonesty. The circumstances that gave rise to [the child's] profound injuries reflect Mother's callous disregard for the child's safety at that time. The [trial] court is not convinced that her grave irresponsibility will not continue.

Trial Court Opinion, 5/16/24, at 6-10.

The record reveals that, on August 29, 2022, the trial court adjudicated the child dependent and awarded legal and physical custody of the child to CYS based upon a finding that CYS proved by clear and convincing evidence the allegations that led to the dependency proceeding. Order of Adjudication and Disposition, 8/29/22, at 1. Upon adjudicating the child dependent, the trial court further ordered that Mother and her boyfriend were to have no contact with the child; that Mother complete parenting classes, follow all

recommendations, and sign a release permitting CYS to verify Mother's completion of the classes; that Mother undergo a mental health evaluation, follow all recommendations, and sign a release permitting CYS to verify Mother's completion; that Mother identify additional family members willing and able to be trained to care for the child; that Mother obtain housing suitable for the child; that Mother cooperate with CYS and provide access to her residence and all household members; that Mother update CYS within 24 hours of any change of address or telephone number; and that Mother submit to random drug screens at CYS's request. *Id.* at 3.

A caseworker for CYS testified that the child was placed with CYS on July 21, 2022, because CYS was concerned that Mother continued to allow her boyfriend to be in the presence of the child and because the child was not receiving proper medical care. N.T., 3/20/24, at 28. By way of background, the caseworker stated that CYS became involved with the child on February 2, 2022, because of reports by Mother that, while she was pregnant with the child, her boyfriend was violent, threatened to harm himself, inappropriately disciplined his own child, and that Mother needed to get the boyfriend "out of her life." *Id.* at 29.

The child was born in late February 2022, and, at birth, did not suffer from her current medical conditions. *Id.* at 44. In March 2022, after an incident involving Mother's boyfriend, the child required medical treatment at a local medical facility due to non-accidental trauma, *i.e.*, child abuse. *Id.* at 9, 45-47. On May 11, 2022, Mother's boyfriend again assaulted the child while

Mother was at work. *Id.* at 30. As a result of this incident, the child suffered severe injuries, including the detachment of her retinas. *Id.* at 47. The child remained in the hospital until June 24, 2022, whereupon the child was discharged to Mother's care and enrolled in a medical daycare during the daytime. *Id.* at Exhibit 5. The boyfriend was arrested and charged with endangering the welfare of a child, 18 Pa.C.S.A. § 4304(a)(1). *Id.* at Exhibit 8. The boyfriend was subsequently released on bail with the condition that he cannot be in the presence of the child. *Id.* at 32. Mother continued, however, to allow the boyfriend to be around the child. *Id.*

Mother subsequently filed a petition seeking a PFA order against her boyfriend because he allegedly harassed both her and the child. *Id.* at 30, 72. Mother withdrew her petition seeking a PFA order in September 2022. *Id.* at 72.

On July 14, 2022, CYS received information that Mother reconciled with her boyfriend and that the boyfriend had direct contact with the child. *Id.* at 31 and Exhibit 5. On July 15, 2022, CYS captured video footage showing Mother with her boyfriend. *Id.* at 31.

On July 18, 2022, while the child was attending an appointment at CHOP, Mother was advised to take the child to the emergency room of the hospital due to "the child experiencing diarrhea, vomiting[,] and irritability which could be an indicator of high brain pressure." *Id.* at Exhibit 5. Mother did not seek treatment of the child in the emergency room. *Id.* On July 19, 2022, CYS was granted emergency protective custody of the child over

concerns that the child was with Mother and her boyfriend and that the child was not receiving proper medical care. *Id.* CYS, however, was unable to immediately locate Mother or the child. *Id.* On July 21, 2022, CYS located the child in a hotel where she was in the presence of both Mother and her boyfriend. *Id.* Mother was subsequently charged with conspiracy to endanger the welfare of a child, 18 Pa.C.S.A. § 903 (18 Pa.C.S.A. § 4304(a)(1)), and conspiracy to commit aggravated assault – attempts to cause serious bodily injury or causes injury with extreme indifference, 18 Pa.C.S.A. § 903 (18 Pa.C.S.A. § 2702(a)(1)). *Id.* at Exhibit 8. Mother's criminal charges remained pending as of the termination hearing. *Id.* at 33.

On August 29, 2022, the trial court adjudicated the child dependent and placed the child in the legal and physical custody of CYS. Order of Adjudication and Disposition, 8/29/22, at 1. As set forth *supra*, the trial court ordered Mother to have no contact with the child and to comply with certain requirements in order to achieve reunification with the child. *Id.* at 3. In addition to the trial court's August 2022 order prohibiting Mother from having contact with the child, the guardian *ad litem* was granted a PFA order that prohibited Mother from having contact with the child. N.T., 3/20/24, at 35. Finally, Mother's bail restrictions stemming from the aforementioned false reports conviction prevented Mother from having contact with the child. *Id.* at 36.

In discussing Mother's fulfillment of applicable reunification requirements, Mother's caseworker stated that Mother has not attended

parenting classes, including parenting classes that only required the parent's participation since Mother was prohibited from having contact with the child. *Id.* at 37. The caseworker was aware that Mother had housing but the caseworker had been unable to access and evaluate Mother's residence despite numerous attempts over the past months. Mother was currently subject to eviction proceedings. *Id.* at 39. The caseworker could not recall if Mother underwent a mental health evaluation.[8] *Id.* at 37. The caseworker was also aware that Mother participated in multiple drug rehabilitation programs, with the most recent program occurring "just a few weeks ago." *Id.* at 40.

On cross-examination, the caseworker acknowledged that, until recently, Mother lived in the same residence for several months, had participated in both in-patient and out-patient drug and alcohol treatment, and has been cooperative with CYS. *Id.* at 59, 61. The caseworker also agreed that, but for the PFA order and Mother's bail restrictions prohibiting her contact with the child, CYS would allow at least supervised visitation between Mother and the child at this stage. *Id.* at 61. The caseworker stated that Mother has made progress towards reunification between the dependency hearing (August 25, 2022) and the termination hearing (March 20, 2024), except for recent positive drug screens. *Id.* at 64.

_____

[8] Mother was diagnosed with bipolar disorder, borderline personality disorder, post-traumatic stress disorder, depression, and anxiety. *See* Petition for Involuntary Termination of Parental Rights, 11/22/23, at Exhibit B.

Mother testified that, since the dependency hearing on August 25, 2022, she received drug and alcohol and mental health counseling and completed rehabilitation as part of her bail requirements. *Id.* at 79. Mother stated that she attempted to arrange for parenting classes but was told that the child needed to be in her care in order for her to participate. *Id.* at 80. Mother also stated that CYS never followed up with additional information about parenting classes. *Id.* at 81. Mother currently participates in a Narcotics Anonymous program and a methadone addiction program. *Id.* at 81. Mother testified that she wants to care for the child and that she cooperated with CYS by providing all of the necessary medical releases. *Id.* Mother also explained that she asked her former attorney to pursue modification of her bail conditions and the PFA order so she might have contact with the child. Her former attorney, however, took no action. *Id.* at 84. Mother testified that she has been employed since January 2024, and that she recently moved on March 6, 2024. *Id.* at 86.

On cross-examination, Mother admitted that, despite a PFA order and a court order stating her boyfriend was not to have contact with the child, she continued to allow her boyfriend to be around the child after the May 2022 incident in which the child's retinas became detached. *Id.* at 94-95. Mother also stated that she has never contacted the foster parents to inquire about the child. *Id.* at 99. Mother also explained that her current residence is a one-bedroom apartment in which she resides by herself. *Id.* at 103. Finally, when asked why Mother continued to allow her boyfriend to have contact with

the child after May 2022, Mother stated, "I mean, it wasn't like anything, like, major to the point where I would have thought that he would have hurt my daughter like that." *Id.* at 106.

Upon review, we concur with the trial court, and the record supports that the conditions which led to the removal and placement of the child continued to exist despite the reasonable, good-faith efforts by CYS. 23 Pa.C.S.A. § 2511(a)(8); *see also C.B.*, 230 A.3d at 348. Mother has had more than 20 months since the child's placement to arrange for, and complete, parenting classes but has failed to do so. Mother has also failed to secure stable housing, having moved several times, and most recently relocating two weeks prior to the termination hearing. Despite attempts to evaluate Mother's housing, CYS has been unable to assess the adequacy of Mother's housing in meeting the specialized needs of the child. It is undisputed that the child suffers from severe deficits caused by child abuse and requires extensive medical care and treatment. No evidence was presented to show that Mother has made any inquiries into the current special needs of the child since the child became dependent or received any necessary training to care for the child. Finally, Mother's criminal convictions remained pending as of the date of the termination hearing, and Mother has taken no steps to seek modification of her bail conditions or the PFA order in order to begin the reunification process with the child.

We also concur with the trial court, and the record supports, that termination of Mother's parental rights would best serve the needs and welfare

- 21 -

of the child, as analyzed under Section 2511(a)(8). As noted by the trial court, the child is in need of "stability and hope" and, due to the profound child abuse injuries, is in need of specialized medical care. Mother has not completed, or even started, parenting classes after more than 20 months, and has not independently demonstrated the ability to provide parental care and stability to the child, including attending to her specialized medical needs. A child's life, and the need for love, hope, comfort, security, and stability, should not be held in abeyance while a parent summons the abilities and the desires to overcome the obstacles that prevent reunification. *See I.J.*, 972 A.2d at 9.

In examining the effects that termination of Mother's parental rights would have on the child, as well as the best interest of the child, pursuant to Section 2511(b), the trial court considered the safety needs of the child, as well as the child's needs for permanency and parental care, including stability, comfort, and hope. Furthermore, the trial court considered the bond between Mother and the child, finding that Mother has not seen the child since August 2022, and noting that Mother has not been a caregiver to the child since birth. Upon review, we concur with the trial court, and the record supports, that termination of Mother's parental rights is in the best interest of the child pursuant to Section 2511(b). The child, due to severe child abuse, requires specialized medical care with constant attention in a sterile environment. N.T., 3/20/24, at 15 (explaining that the child needs help with every aspect of her life including feeding, changing, eating, rolling, and stretching). As the foster caregiver testified, a "normal" day in the life of the child requires a

caregiver to stretch and reposition the child several times throughout the day in order to stimulate muscle movement. *Id.* at 16, 18. The child also receives medication six times a day and is fed, *via* a feeding tube, four times during the day and once overnight. *Id.* at 16. The foster caregiver also explained the importance of maintaining a "very clean" and healthy living environment for the child. Mother, on the other hand, has not seen the child since July 2022, when Mother and her boyfriend removed the child from hospital treatment against medical advice and were found living in a hotel. *Id.* at Exhibit 5. Mother also admits that the only medical training she received about how to care for the child was limited to the child's July 2022 hospitalization. *Id.* at 93 (explaining that, Mother received training on how to use the child's feeding tube).

For these reasons, we concur with the trial court, and the record supports, that CYS has proven by clear and convincing evidence that grounds for involuntary termination of Mother's parental rights exist under Section 2511(a)(8) and (b). Consequently, we discern no error of law or abuse of discretion in the order terminating Mother's parental rights to the child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 08/15/2024